UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| T1 Payments, LLC, | Case No. 2:19-cv-01816-APG-DJA |
| Plaintiff, | |
| v. | Order |
| New U Life Corporation, | |
| Defendant. | |
| And related counterclaims. | |

This is a breach of contract action arising out of a credit card processing agreement between Plaintiff T1 Payments and Defendant New U Life. New U has asserted counterclaims against T1 Payments, T1 Payments Limited, TGlobal Services Limited, Donald Kadson, Debra Karen King, Amber Fairchild, (collectively, the "T1 Parties"), Lefebvre International Corporation, Marc Lefebvre (collectively, the "Lefebvre Parties") and Payvision, B.V.  Both New U and the T1 Parties have moved to compel each other to respond to discovery requests. (ECF Nos. 157 and 158).  Because the Court finds that certain of New U' requests are not proportional, it grants New U's motion in part.  Because the Court finds that the T1 Parties can first attempt to obtain the information they seek via their deposition of Marc Lefebvre, the Court denies the T1 Parties' motion as premature.  The Court finds these matters properly resolved without a hearing.  LR 78-1.

I.    **Background.**

T1 Payments sued New U after, as T1 Payments alleges, New U terminated the credit card processing agreement between the two parties early. (ECF No. 1 at 2).  T1 Payments argues that this was a default under the agreement and thus, it is entitled to retain funds that New U held in accounts under that agreement.  (*Id.*)  New U counterclaimed, adding entities and individuals

affiliated with T1 Payments—the T1 Parties—and Payvision. (ECF No. 85). New U argued that these counterclaim defendants engaged in a scheme to manufacture the alleged "default" to unlawfully retain New U's funds. (*See id.* at 2-3). Discovery has since been stayed as to Payvision—based in the Netherlands—while the Court resolves whether it has jurisdiction over it. (ECF No. 148).

Now, New U argues that the T1 Parties have inadequately responded to New U's interrogatories and requests for production directed to TGlobal and T1 Payments. (ECF No. 157). T1 Payments argues that New U has inadequately responded to its requests for production. (ECF No. 158). Both parties ask the Court to compel responses.

## II.   Standard.

If a party resists discovery, the requesting party may file a motion to compel. *See* Fed. R. Civ. P. 37(a)(1), (a)(3)(B)(iii)-(iv) ("A party seeking discovery may move for an order compelling an answer, [or] production ... if ... (iii) a party fails to answer an interrogatory submitted under Rule 33; or (iv) a party fails to produce documents ... as requested under Rule 34."). The motion must include a threshold showing that the requested information falls within the scope of discovery under Rule 26. *See Sanhueza v. Lincoln Technical Institute, Inc.*, No. 2:13-cv-2251-JAD-VCF, 2014 WL 6485797, at *2 (D. Nev. Nov. 18, 2014) (citing *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992)). To be discoverable under Federal Rule of Civil Procedure 26(b)(1), information must be: (1) relevant to any party's claim or defense; and (2) proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). The party opposing discovery has the burden of showing that the discovery is, among other things, irrelevant, overly broad, or unduly burdensome. *See Fosbre v. Las Vegas Sands Corp.*, No. 2:10-cv-00765-APG-GWF, 2016 WL 54202, at *4 (D. Nev. Jan. 5, 2016) (citing *Graham v. Casey's General Stores*, 206 F.R.D. 251, 253-54 (S.D. Ind. 2000)). To meet this burden, the objecting party must specifically detail the reasons why each request is objectionable. *See Fosbre*, 2016 WL 54202, at *4.

Federal Rule of Civil Procedure 26(b)(2)(C) further limits discovery and allows the Court to restrict discovery where it is "outside the scope of Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(3). In deciding whether to restrict discovery under Federal Rule of Civil Procedure

26(b)(2)(C), the Court "should consider the totality of the circumstances, weighing the value of the material sought against the burden of providing it, and taking into account society's interest in furthering the truth-seeking function in the particular case before the court." *Caballero v. Bodega Latina Corp.*, No. 2:17-cv-00236-JAD-VCF, 2017 WL 3174931, at *3 (D. Nev. July 25, 2017) (internal citations and quotations omitted). Fed. R. Civ. P. 26 gives the Court broad discretion to "tailor discovery narrowly and to dictate the sequence of discovery." *See id.* (internal citations and quotations omitted).

**III.   Discussion.**

  *A.   The Court grants New U's motion to compel in part.*

  **INTERROGATORY NO. 1:**
  State the date, time and amount of each deposit of NEW U LIFE FUNDS[1] received by TG[2] at any point in time on an item-by-item basis.

New U argues that it is entitled to a response to this interrogatory because it is entitled to know where its money is being held. It explains that Donald Kadson testified that Payvision held some of New U's funds. This contradicted Maria Alida Johanna Ruijters-Terpsra—Payvision's representative—who testified that Payvision paid New U's funds to TGlobal.

The T1 Parties respond that there is nothing to compel in response to this interrogatory. They explain that the statements by Payvision's representative answers the question of the location of New U's money. And further, the funds are commingled, so the T1 Parties argue that it would be impossible to itemize which funds are New U's.

---

[1] "NEW U LIFE FUNDS" is defined as funds flowing from "any and all transactions submitted by NEW U LIFE for processing pursuant to the CPPA." "NEW U LIFE" means and refers to New U Life Corporation, New U Life Limited, and their officers, directors, agents, employees and representatives, including but not limited to Alexy Goldstein and Matt Hutka." The "CPPA" "means and refers to the Merchant Services Application and Card Payment Processing Agreements between T1 Payments LLC and NEW U LIFE signed by Alexy Goldstein on or about October 26, 2018 and October 30, 2018, and any and all addenda and appendices thereto."

[2] "TG" means and refers to "TGlobal Services Limited and its officers, directors, agents, employees and representatives, including but not limited to Donald Kadson, Debra King and Amber Fairchild."

In reply, New U argues that the T1 Parties cannot point to another party's deposition to answer the interrogatories, especially because the deposition does not fully answer the interrogatory. To the T1 Parties' argument that the funds were commingled, New U offers a suggestion: that the T1 Parties should give the responsive information for each deposit into the TGlobal account and calculate how much of each deposit consisted of funds attributable to New U's processing activity.

The Court is unconvinced by the T1 Parties' arguments that the information sought by this interrogatory is irrelevant, overbroad, or unduly burdensome. Rather, it would serve to clarify a specific contradiction that New U has uncovered in this litigation and is relevant to New U's claims of conversion. New U has also offered to amend its request to contemplate commingled deposits. Because the relationship between New U and the T1 Parties was short—approximately two weeks—the updated request is inherently limited, and the T1 Parties have not described how providing responsive information would be unduly burdensome. The Court thus grants New U's motion to compel a response to this interrogatory.

**INTERROGATORY NO. 2:**
IDENTIFY[3] each bank account where TG has held NEW U LIFE FUNDS at any point in time.

New U argues that the answers to this interrogatory are relevant to its claims that TGlobal tortiously converted New U's funds to third party bank accounts. This information—account number, name and address of the bank, and beneficiary name—is basic, New U argues, and not burdensome to provide. New U has also agreed to limit the time frame for this interrogatory to 2018-2019.

The T1 Parties make irrelevant arguments in response to this interrogatory. They claim that the responses would somehow reveal information about other merchants that New U would misuse, and which would not reveal the transfer of funds because the funds were commingled.

---

[3] "IDENTIFY" when used in reference to a bank account means "stating the name and address of the bank, the name of the beneficiary, and the account number."

However, the interrogatory doesn't seek merchant information or the information about the transfer of funds. And while the T1 Parties argue that the amount and location of the account are undisputed, they also refuse to identify the account at issue. Nor does the information sought have to relate to an element of one of New U's claims, as the T1 Parties argue.

The Court is not convinced by the T1 Parties' arguments against responding to this interrogatory. Rather, the information sought is relevant and proportional to New U's theories in the litigation. The Court thus grants New U's motion to compel with respect to this interrogatory, limited to information from 2018 to 2019.

**INTERROGATORY NO. 3:**
State the current balance of NEW U LIFE FUNDS being held in each account IDENTIFIED by YOU in response to Interrogatory No. 2.

New U argues that this information is relevant to its question of where its funds are being held. The T1 Parties, however, argue that they have already produced responsive information to this request and that they would be unable to extrapolate the amounts attributable to New U from other amounts held in this account. However, again, the T1 Parties do not identify or state any balance held in this (or these) accounts. The Court is not convinced that the T1 Parties have produced responsive information and thus grants New U's motion to compel a response to this interrogatory. To the extent that the T1 Parties cannot extrapolate an amount attributable to New U, they must provide the total amount held in each account.

**INTERROGATORY NO. 4:**
IDENTIFY each third party bank account to which TG has transferred NEW U LIFE FUNDS at any point in time.

The T1 Parties respond to this request that there is nothing to compel because they have never transferred any New U funds from any *TGlobal* bank account to any third-party bank account. New U replies that this response leaves open the possibility that its funds were transferred from an account held by another related party other than TGlobal. New U explains that it is not comfortable with this possibility because, in their initial response to this interrogatory, the T1 Parties did not consider TGlobal's bank account to fit under the umbrella of

the "TG Parties" defined in the interrogatory. Because the interrogatory asks that the T1 Parties identify any third-party bank to which TGlobal transferred New U's funds—regardless of whether the funds originated in TGlobal's account—the Court finds that the T1 Parties' response is evasive. The Court grants New U's motion to compel a non-evasive response to this interrogatory.

**INTERROGATORY NO. 5:**
For each bank account IDENTIFIED by YOU in response to Interrogatory No. 4, state the date, time, and amount of each transfer of NEW U LIFE FUNDS to such account on an item-by-item basis.

Like its response to interrogatory No. 5, the T1 Parties argue that there is nothing further to compel because they never transferred any funds from the TGlobal account, and the funds remain in the TGlobal account to this day. New U, however, argues that the T1 Parties did not include this information when responding to the interrogatory and that, including it in the response to the motion to compel is insufficient. The Court agrees. If the T1 Parties assert that they have never transferred any funds and the New U funds remain in the TGlobal account, they should supplement their interrogatory response with this answer. To the extent that New U's funds were commingled, the T1 Parties should provide the date, time, and amount of transfers from the account to any third-part accounts beginning from October 26, 2018 (the date the agreement between New U and T1 was executed) to the present. The Court thus grants New U's motion to compel a response to this interrogatory.

**INTERROGATORY NO. 6:**
Describe all debits to NEW U LIFE FUNDS from any bank account IDENTIFIED by YOU in response to Interrogatory No. 2 on an item-by-item basis, including debits for fees, chargebacks, refunds, and disbursements, by stating the date, amount and purpose of each debit.

New U moves to compel this information, arguing that it is particularly vital to its claims after Donald Kadson testified that some portion of New U's funds are held by Payvision, and that profit is being "stripped" from the bank account where New U's funds are held. The T1 Parties respond that there is nothing to compel because they have already provided documents listing all

fees, chargebacks, refunds, and disbursements with resect to funds processed for New U. They further explain that these funds were not debited from any account over which TGlobal had control, only from Payvision's accounts. New U replies that this response fails to identify debits from TGlobal's account where—as Ruijters-Terpsra testified—Payvision sent New U's funds. The Court finds this information relevant to New U's claims and goal to clarify where its funds have moved. The Court also finds that this information is proportionate under New U's limitation, asking for responsive information from May 13, 2019 to the present. The Court thus grants New U's motion to compel a response to this interrogatory. To the extent that these accounts contain commingled funds, the T1 Parties should identify all debits and disbursements.

**INTERROGATORY NO. 14**
IDENTIFY each MERCHANT[4] whose transactions have been processed through TG's MERCHANT ACCOUNT[5] (under a submerchant account or otherwise) since December 13, 2016.

**INTERROGATORY NO. 15:**
For each MERCHANT IDENTIFIED by YOU in response to Interrogatory No. 14, state the start and end dates of processing and the total volume of MERCHANT TRANSACTIONS[6] processed.

New U argues that this information is relevant to its theory that T1 illegally aggregated New U's transactions with those of other merchants, that the information will reveal potential witnesses, and can demonstrate that the T1 Parties had a pattern of terminating merchant accounts after a short period of time. New U also asserts that it is willing to limit this request to 2018-2019

---

[4] "MERCHANT" means and refers to any business that submitted transactions for processing pursuant to a written agreement with TG or any TG-RELATED ENTITY. "TG RELATED ENTITY" "means and refers to T1 Payments LLC, T1 Payments Limited, and any other entity that is owed or controlled by Donald Kadson, Debra King or Amber Fairchild, or any other officer or director of TG, T1 Payments LLC or T1 Payments Limited.

[5] "MERCHANT ACCOUNT" "means and refers to any and all merchant accounts opened by TG at PAYVISION pursuant to the December 13, 2016 merchant agreement between TG and PAYVISION, including but not limited to the 2017 amendments and any and all other amendments, addenda and appendices thereto.

[6] "MERCHANT TRANSACTIONS" means "any and all transactions submitted by a MERCHANT for processing pursuant to a written agreement with TG or any TG-RELATED ENTITY."

to assuage any burden it might impose. The T1 Parties vehemently object. They explain that the information sought is overbroad, unduly burdensome, and untimely. They argue that they process transactions for thousands of merchants so even gathering responsive information limited to the 2018-2019 period would put a tremendous strain on T1 Payments' single remaining employee. They also argue that the information has nothing to do with the relationship between the T1 Parties and New U but is an attempt by New U to introduce character evidence and subpoena new witnesses with only a short time left in discovery. The T1 Parties explain that New U had time to seek additional witnesses and subpoenaing them now would create a massive discovery record.

In reply, New U argues that it needs this information to see whether the T1 Parties really cannot identify which funds are New U's because they are commingled. New U also asserts that the information is not available publicly and New U has no other way of obtaining it. Finally, New U reasserts in conclusory fashion that the information is not broad and claims that the T1 Parties have not explained why it would be burdensome to gather it.

The Court is not convinced that the relevance of this information outweighs the burden described by the T1 Parties. While New U doubts the T1 Parties' representations regarding the commingled nature of funds and the strain placed on T1 Payments' single employee, the Court does not believe New U's doubt—without more—justifies these broad requests. Additionally, it appears that one of the main reasons New U seeks this information is to identify other merchants to subpoena. But this case has been going on since 2019 and is reaching the end of its discovery phase. New U also fails to explain why or how this information would show that the T1 Parties were illegally aggregating transactions to justify the breadth of the requests. The Court thus denies New U's motion to compel a further response to these requests.

> **REQUEST FOR PRODUCTION NO. 10:**
> All DOCUMENTS[7] that evidence, constitute, refer and/or relate to the December 13, 2016 merchant agreement between TG and

---

[7] "DOCUMENTS" means "handwritten, printed, Photostat, recorded, written, graphic, photographic, magnetic, or electronic matter (including, without limitation, audio and/or video tape recordings, electronic mail, and material for computer use), including all original and duplicates, and includes the original or a copy of handwritten, typewritten, printed, and every other means recorded upon any tangible thing and form of communication or representation

>PAYVISION, including but not limited to the 2017 amendments and any and all other amendments, addenda and appendices thereto.

New U moves for this Court to compel the T1 Parties to produce an unredacted copy of Appendix 1 to the agreement that the T1 Parties produced in response to this request for production. The T1 Parties did not respond to this portion of New U's motion. Because the failure of an opposing party to file points and authorities in response to any motion constitutes a consent to granting of the motion, the Court grants New U's request. *See* LR 7-2(d). The T1 Parties must produce an unredacted copy of Appendix 1.

>**REQUEST FOR PRODUCTION NO. 94:**
>All DOCUMENTS that refer and/or relate to any disputes between T1 and any MERCHANT since January 1, 2017.
>
>**REQUEST FOR PRODUCTION NO. 96:**
>All COMMUNICATIONS between T1 (including its lawyers) and any MERCHANT (including any lawyer representing the MERCHANT) regarding, relating and/or referring to DISPUTED FUNDS[8] since January 1, 2017.

New U argues that it requires the information in these requests to determine whether seventeen Better Business Bureau complaints against T1 Payments are accurate to make its racketeering and intentional fraud claims. The T1 Parties argue that the requests are overbroad and unduly burdensome, particularly on the one remaining employee who would have to dig through thousands of emails and documents to find responsive information. The T1 Parties also explain that some of the information may have been lost in a "data transfer gone awry." New U replies that the T1 Parties' law firm should be capable of helping with gathering the data that would be difficult for the T1 Parties' single employee. New U also argues that it only recently

---

including computer hard discs, letters, words, pictures, sounds, symbols, or combinations of them."

[8] "DISPUTED FUNDS" is defined as "MERCHANT TRANSACTION proceeds held by T1 as reserves, suspended funds, or setoff funds that are the subject of a dispute between T1 and the MERCHANT."

learned of the spoliated evidence by the data transfer and thus the T1 Partis should supplement their responses to explain how and when the evidence was lost or destroyed.

The T1 Parties have made a compelling argument that the burden of these requests outweigh their relevance.  While New U argues that these documents could show a pattern and intent by the T1 Parties, the T1 Parties have explained that the effort required of its single employee to provide this information is enormous.  Moreover, the information ultimately produced might not show what New U seeks.  As requested, the information sought may be relevant, but is disproportionately vast.  The Court thus limits these requests.  New U must identify five complaints to the Better Business Bureau for which T1 Parties shall provide responsive information.  Because it is only raised briefly in passing by both sides, the Court declines to rule on the data-transfer-gone-awry issue.

> **REQUEST FOR PRODUCTION NO. 95:**
> All COMMUNICATIONS[9] between T1 (including its lawyers) and any MERCHANT (including any lawyer representing the MERCHANT) regarding, relating and/or referring to any Early Termination Fee assessed by T1 or any T1-RELATED ENTITY since January 1, 2017.
>
> **REQUEST FOR PRODUCTION NO. 97:**
> All COMMUNICATIONS between T1's lawyer and any MERCHANT (including any lawyer representing the MERCHANT) regarding, relating and/or referring to any Early Termination Fee assessed by T1 or any T1-RELATED ENTITY since January 1, 2017.

New U argues that this information is relevant to showing whether the T1 Parties had a pattern of wrongfully using the early termination fee as a pretext for keeping merchants' money.  New U also explains that it seeks to use this information to identify other potential witnesses.  New U offers to limit this request to only ask for a list of each merchant who was charged an early termination fee.

---

[9] "COMMUNICATIONS" means "any oral or written exchange or transmission of words, whether in-person, telephonic, computerized, or through any other medium, including email, chat and text messages, and whether direct or through one or more intermediaries."

The T1 Parties respond that the request is unduly burdensome because it would require the single remaining employee to manually search through thousands of individual merchant files to find out whether an early termination fee was imposed. On the other hand, the T1 Parties point out that New U has access to at least some of this information because its attorneys have represented other merchants with similar claims against the T1 Parties. In reply, New U does not address this argument, but argues that the T1 Parties did not thoroughly explain why the search for this information would be burdensome on the single employee.

The Court finds the T1 Parties' arguments compelling. The T1 Parties have argued that New U already has access to some of the information it seeks, but nonetheless seeks to compel the T1 Parties' single employee to conduct an expansive manual search. New U has not responded to this argument, but instead sought to discredit the T1 Parties' concern with the breadth of the request. Because this request is disproportionally burdensome and potentially duplicative in comparison to its relevance—especially because New U may have another source for this information—the Court denies New U's motion to compel responses to these requests.

### B.     The Court denies T1 Payments' motion to compel.

In determining whether settlement agreements and negotiations may be discoverable, courts use two different approaches: (1) the Rule 26 standard or; (2) the "particularized showing" standard. *See* Robert E. Larsen, *Navigating the Federal Trial*, § 19:32 (2021). While the United States District Court for the District of Nevada has not chosen one approach over the other, it has noted that "[s]ome courts require a party seeking disclosure of a confidential settlement agreement to make a particularized showing of a likelihood that admissible evidence will be generated by disclosure of the terms of the confidential settlement agreement." *E&R Venture Partners*, No. 2:16-cv-02959-RFB-GWF, 2017 WL 1734023, at *2 (D. Nev. May 2, 2017).

There is no federal privilege preventing the discovery of settlement agreements and related documents. *Board of Trustees of Leland Stanford Junior University v. Tyco Intern. Ltd.*, 253 F.R.D. 521, 523 (N.D.Cal. 2008); *Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 282 (N.D. Cal. 2015); and *Thermal Design, Inc. v. Guardian Building Products, Inc.*, 270 F.R.D. 437, 438 (E.D.Wis. 2010). The court in *Board of Trustees of Leland Stanford* noted that

Congress enacted Federal Rule of Evidence 408 to promote the settlement of disputes by limiting the admissibility of settlement materials, rather than prohibiting their discovery. 253 F.R.D. at 523 (quoting *In re Subpoena Issued to Commodity Futures Trading Commission*, 370 F.Supp.2d 201, 211 (D.D.C. 2005)). Under Rule 408, evidence of compromise offers or settlement negotiations are inadmissible to prove or disprove the validity or amount of a disputed claim. *See* Fed. R. Evid. 408. Such evidence may, however, be admitted for other purposes. *E&R Venture Partners*, 2017 WL 1734023, at *2.

Although not amounting to a recognized privilege, public policy generally favors confidential settlements because they often assist parties in resolving their disputes by mutual agreement. Accordingly, "[t]he secrecy of a settlement agreement and the contractual rights of the parties thereunder deserve court protection." *Kalinauskas v. Wong*, 151 F.R.D. 363, 365 (D. Nev. 1993). There are, however, limits to such protection. *E&R Venture Partners, LLC*, 2017 WL 1734023 at *2.

For example, under Federal Rule of Evidence 408, evidence of a settlement agreement may be admissible to prove witness bias or prejudice. Fed. R. Evid. 408. Courts in this district have also found the amount of a settlement appropriate to show offset. *See Chartered Development Corp. v. Allstate Insurance Co.*, No. 2:06-cv-01309-LDG-LRL, 2009 WL 10692853, at *4 ("Courts can and do compel disclosure of settlement agreements to allow parties to determine the extent of their liability…[however] Transcontinental has failed to show why any information other than the amounts are necessary to calculate any potential offset…").

Here, the Court denies the T1 Parties motion to compel as premature because they can obtain information about the settlement agreement and negotiations to show bias and offset during depositions. The T1 Parties seek to compel two categories of documents: (1) the settlement agreement between the Lefebvre Parties and New U and all documents and communications between the Lefebvre Parties and New U as part of the settlement; and (2) all documents exchanged between New U and the Lefebvre Parties that refer or relate to any of the parties or claims in the case, regardless of whether they pertain to settlement. (ECF No. 158). The T1 Parties did not respond to New U's argument that it already provided responsive

information to the second category of documents; thus, the Court denies the T1 Parties' motion to compel regarding those documents. *See* LR 7-2(d). However, the T1 Parties argue that they are entitled to the settlement agreement between the Lefebvre Parties and New U and all documents and communications surrounding it.

As a preliminary matter, the Court finds the "particularized showing" standard persuasive here. This district has both acknowledged the use of this approach and the public policy behind giving greater protection to confidential settlement agreements than Rule 26 provides. So does this Court. However, the Court is not convinced that the T1 Parties have failed to carry their burden under the "particularized showing" standard. While the Court declines to decide whether the T1 Parties are entitled to each piece of information they have requested in the form they have requested it at this stage, the T1 Parties have made a particularized showing that they require settlement information to establish bias and offset.

However, the T1 Parties have not demonstrated a particularized showing that they need the settlement agreement itself and the communications surrounding the negotiations. Rather, it appears that they can obtain this information during their deposition of Marc Lefebvre. The T1 Parties have asserted that New U's refusal to provide any information at all about the settlement agreement and negotiations during a meet and confer prompted this motion. (ECF No. 163 at 4). This suggests that the T1 Parties' discovery needs could have been met had New U simply answered their questions. But the T1 Parties have an upcoming opportunity to ask these questions relevant to bias and offset: Marc Lefebvre's deposition. Asking these questions at the deposition would balance the T1 Parties' entitlement to information about bias and offset with New U's entitlement to a level of protection over its confidential settlement agreement and negotiations. The Court thus denies the T1 Parties motion to compel as premature.

**IT IS THEREFORE ORDERED** that New U's motion to compel (ECF No. 157) is **granted in part** as outlined in this Order.

**IT IS FURTHER ORDERED** that the T1 Parties' motion to compel (ECF No. 158) is **denied** as premature.

DATED: November 17, 2021

_____
DANIEL J. ALBREGTS
UNITED STATES MAGISTRATE JUDGE